All right. The next case is Mattoon Kawasaki Yamaha v. The Department of Revenue. Mr. Castle, who's going to argue? Oh, Mr. Shearer. Mr. Shearer, okay. Thank you. And Mr. Barrow? May it please the Court. I'm sure you hear all the time that everybody's cases are black and white, so I'm not going to say that. Instead, I'll just say simply that this is a lot less gray than I thought it was going to be. The facts are very straightforward and undisputed. My name's Chris Shearer. I represent Mattoon Kawasaki Yamaha, Inc. And our client, when they receive a motorcycle vehicle from the manufacturer, they pay a dealer invoice amount, which consists of the wholesale cost of the vehicle, or otherwise, the terminology was also used, dealer net cost. So wholesale cost, dealer net cost. They also pay a transportation or freight charge on top of that. And in addition, there's a dealer reserve payment that was made. And both of these, these three things were paid for both Kawasaki and Yamaha vehicles. The Department of Revenue determined that upon the sale of these vehicles, the dealer reserve payment that was refunded back or reimbursed to our client upon the sale to a consumer, that reimbursement constituted part of the consideration of the transaction. And that was taxable under the Retailer Occupation Tax Act. One of the, I mean, the gist of the Department's position that appears in the record is that these, and they say it very succinctly on page 13 of their brief, that the facts fall squarely within the language of section 130.215 paragraph E and example 1. That falls in the Department's regulations governing the Retailer Occupation Tax Act. The example that they look at discusses dealer cash. The specific language from the regulation says that the taxation of dealer incentives will depend upon whether the dealer receives a payment from a source other than the purchaser that is conditioned upon the retail sale. So the operative language is receipt of payment conditioned on the sale. Well, the record clearly indicates that there is more involved in the reimbursement payment of the dealer's reserve payment to the dealer than simply the sale of the vehicle. There are multiple requirements that must be met. The vehicle has to be paid off within a certain amount of time. The paperwork needs to be done in a certain way. Everything has to be done perfectly whenever the company goes over it with the white glove. And financing companies need to review the floor plan. So... Counsel, can you get the reserve payment back if the vehicle isn't sold? No. My understanding based on the record is no. If the vehicle is not sold, then no. Our point is that it's not solely conditioned on the sale. That a sale is one of a variety of factors that need to be met in order for the dealer reserve payment to be refunded. Can I ask you a question? Yes. In my mind, I think about the cost of goods sold. Yes. So I imagine that the dealer includes that 5% figure in the cost of the car to him at the time he's buying it. When he sells it, is he reducing the cost by that 5%? I don't think the record demonstrates exactly what the dealer is doing. But from the manufacturer's standpoint, the manufacturers... Let me make sure I get the terminology right. The dealer net cost that's set by the manufacturer is unchanged regardless of whether there's a program involved or not. That is constant, and the dealer reserve payment is simply on top of that. Now as far as the... Let's take an example. Let's say you sell a car for... No, let's see. Your cost is $40,000 for the car to the dealer. He pays $40,000. And that includes the 5% that's tapped on above, right? The 5% reserve? Okay. And he turns around and sells that car for... Let's see if I can do this right. So his cost is $40,000, including the add-on. Let's say he sells it for $42,000. And he gets a 5% rebate from the manufacturer. So is his cost still the $40,000? So in other words, he's making a profit of $2,000. Well, we're not... Under the Retailer Occupation Tax Act, the focus is not the cost. The focus is not the profit. The cost is what was the sale?  What were the receipts for that sale? So whether the dealer's profit is $1,000 or $2,000, we're focusing on what is the consideration involved in the transaction. So the $42,000 under your scenario, that's what would be taxed. But from the dealer's standpoint, the evidence that we have in the record is an affidavit from a certified public accountant that works with Mattoon Kawasaki. That appears on page 205 of the record. It was attached to the Department's Motion for Summary Judgment. And it clearly says that, quote, the payment and reimbursement of a dealer reserve payment has no economic effect on Mattoon Kawasaki Yamaha Inc.'s balance sheet. So in other words, the dealer's not getting any richer by getting its refund, by getting its deposit back, by getting the dealer reserve payment back to them. Now, the record also establishes, based on the transcript of Terry Glaze, the vice president of Mattoon Kawasaki, that some dealers don't get that refund payment back. If they don't meet the requirements that are set forth by the manufacturer, the dealer reserve payment does not come back to them. So that just operates as a penalty to the dealer. Well, if he's got to make a 5% reserve payment, and if he follows other rules, sells the unit, he gets that back. His own money that he's paid, he gets back. But if he doesn't sell, then he loses the 5%. Right. Yeah, it's a carrot and a stick approach of trying to provide the dealers with some incentive to follow the plan that's laid out by the manufacturer. So it's our position that the department's analysis in this matter, and the department's reliance on example one of that regulation, it just disregards the economics of the transaction, and there's nothing in that regulation that specifically addresses this particular scenario. The economics of the transaction is that the dealers are getting their own money back. And that's in the record at 175, Terry Glaze's transcript. Dealers aren't receiving new money for complying with this. They're getting their own money back. The manufacturers aren't providing the dealers with money out of the manufacturer's bucket. The manufacturer is holding on to the dealer's money and giving it back if they comply with the terms of the program and hanging on to it if they don't. And Mr. Glaze's transcript also indicated that the manufacturer does not reduce the vehicle's price by taking into consideration the dealer reserve payment. So in essence, the department, as we've maintained throughout these proceedings, is taxing the return of a security deposit. Now the department, in their brief, expressed some concern that there would be possible collusion between manufacturers and dealers that could defeat the tax if formal labels could control the economic substance of the transaction. So again, I point to the economic substance that appears in the record and number one, the accountant for the Mattoon Kawasaki indicated that these things have no net effect on the dealer's balance sheet. Also, the section relied on by the department discusses sales that occur after July 1, 2008, and the transcript in the record indicates that the Kawasaki dealer reserve program has been in existence since the early 1980s. Yamaha's program started in 1987, and throughout this process, Terry Glaze testified that it was their understanding that that's their money that they're getting back whenever they meet the requirements and they get the dealer reserve payment back. So based on the evidence we have in the record, it's not a disguise rebate. There's no collusion. There's nothing wrong or untoward going on in that it's not a scheme to avoid tax. So getting away for a moment from the regulations and focusing on the statutory language, which I think is where the starting point should be and where I think it ends, section 2-10 of the Retailer Occupation Tax Act provides for a tax on gross receipts from sales of tangible personal property made in the course of business. Under the definitions section, gross receipts is defined as the total selling price or the amount of such sales as here and before defined, and selling price or amount of sale is defined as consideration for a sale valued in money, whether received in money or otherwise. So the question is where's the consideration here? If the dealers are providing the manufacturer with their own money, they meet the requirements and they get their money back, that's not consideration. The return of the dealer's reserve payment is not a part of the selling price, and that's what was indicated in Mr. Glaze's transcript, 203 of the record. The dealer's net cost is the same regardless of whether there's a dealer reserve payment required or not. And again, because the dealer reserve payment has historically been viewed by the dealers, by Mr. Glaze in particular, as a refund of their own money, again, we don't believe there's consideration. So we request that the judgment of the Coles County Circuit Court be reversed and remanded with instructions to enter judgment in favor of Mattoon Kawasaki and have the protested amounts of sales tax for the dealer reserve payments refunded to us. I'd be happy to answer any further questions you might have. I don't see any. Thank you. You'll have additional time on your bottle. May it please the Court, Counsel, Brian Barrow, Assistant Attorney General, on behalf of the Illinois Department of Revenue and the State Treasurer, let me begin by addressing Justice Pope's question, which I think also addresses a central argument made by the taxpayer. And that's this. How payments to a retailer are accounted for on the retailer's balance sheet or otherwise are not relevant to the determination of whether they qualify as grocery sheets. And that's very clear from the argument placed on the plaintiff's decision. So their accounting treatment is not evidence of whether or not the payments are grocery sheets or not. It's very clear, under Illinois law, any payments made to a retailer are related to the sale of an individual item of personal property or taxable grocery sheets. Well, let me ask you this question, because it's almost like a return of a security deposit, isn't it? No, it's not a return of a security deposit. Why not? It's not a return of a security deposit because, first of all, in order to receive the inventory, the Mattoon Kawasaki had to pay dealer invoice price. That's the entire price of the vehicle. This program was not optional. They couldn't receive a motorcycle if they only paid their dealer net cost. They had to pay the dealer net cost and the reserve and the transportation charge, obviously, to receive the inventory. So in that sense, it's not a sort of escrow or security deposit. And more importantly, I think, they had to sell the vehicle to get the money. They had to pay this amount of money. It was not something where they didn't sell the vehicle and they returned it after a period of time and they got the money back. The payment of the dealer reserve is tied to the sale of the individual item of inventory. And that's where Illinois law has distinguished between taxable gross receipts and non-taxable gross receipts. But in the normal rebate process, the manufacturer is giving something extra to the dealer. So the purchaser pays for the car, and then the manufacturer pays an additional amount to the dealer in the form of a rebate, and then he's got to pay the full tax on those two amounts. This is a little different because this is the dealer giving the manufacturer a certain amount of money that the manufacturer holds, and then he gets back his own money. Well, it's not his own. I mean, that's the conclusion, but that's not. There has to be facts showing that. And while this is not a rebate, it functions in many ways like a rebate. Rebates can function in a couple of different ways. A manufacturer can give a rebate directly to a customer, or a manufacturer can give a rebate to a dealer. Now, the Keystone Chevrolet case made it very clear. A dealer cannot reduce his gross receipts by payments of a rebate directly to a customer because, again, the question is, what did the dealer, the seller, receive in money, in the total amount of money? That's the test. A non-taxable incentive would be an incentive that is not related to the sale. These payments were related to the sale. Therefore, they are taxable gross receipts. Now, if there's something other than that, Mattoon Kawasaki had the burden of proof. They had to do it with its own books and records. And again, this is another case, a case where they simply haven't supported their conclusion that this is an escrow. That's their legal conclusion, that this is an escrow or a security deposit or something other than a gross receipt. But again, if you look at the facts, as I just stated, they have no choice but to enter into this program. To get the inventory, they have to pay the full price. They don't get the money, the payment, unless they sell the vehicle. Those are the facts that prove that this is not the return of their money. It's money coming out of the manufacturer's pocket and being given back to Mattoon if they meet the sales conditions. But where did the money come from initially? Where does the money come from? It comes from the payment made to the manufacturer. But it's then the manufacturer's money. It's the total cost of the vehicle. But in that example one that's contained in the regulations or the statute or whatever, in that case, the dealer's getting $38,000 from the buyer and he's getting $1,000 from the manufacturer. That's different than this. It isn't different. It's $1,000 extra money. Not his own money coming back to him. But it isn't his own money. Because once he pays for that vehicle from the manufacturer, it's not their money anymore. That's the cost of the vehicle. But the setup from the beginning is if you do 1, 2, 3, you'll get your dealer's reserve back. Right, but it's conditioned upon... They're getting more money back. In other words, at the end of the day, they have more money because they're getting this dealer's reserve back. It isn't any different in its essence than the rebate. If the manufacturer says, we will rebate $3,000 back to you if you sell this vehicle, you have extra money. You don't count it against the payment from the dealer to the manufacturer. So the fact that they can cut this up this way doesn't really tell you what the real substance of the transaction is. The substance of the transaction is the manufacturer's money is being paid back to the dealer and conditioned upon the sale of the vehicle. What about Mr. Shearer's point that this has been going on? This is the way they've operated since the 1980s. I think that's right. I think Mr. Glaze runs a tight ship, and I think it's very admirable, and he gets his money back all the time. He looks at this as his money, but it's not a security company. What I'm asking you is the Department of Revenue has never tried to enforce this against that dealer's reserve before, have they? I believe they've been paying this along. I don't know what the history of this dealer's reserve payments are. But even if they have not been, there's no sort of estoppel against the state. I'm just wondering why all of a sudden they're trying to collect this when they hadn't for 25 years. Because the state's broke? I'm not sure what the record is. The record could be that this is the first time anybody's objected to it as equally as this is the first time they've collected it. The record doesn't reflect whether it's been collected in the past without objection. But with this dealer? With this dealer. Well, he said they've been operating this way since the early 80s. But I don't think the record reflects whether or not they've been collecting. I mean, there was two programs here. There's a rebate program, and there's a dealer's reserve program. The rebate program, the strict rebate program, was objective. I don't know how this dealer's reserve, if this is the first time the dealer's reserve program has been subject to a sales tax. That's what I'm getting at. That's what you're getting at. I'm not sure if the record reflects that. But in any case, let me turn back to this sort of late. So putting aside the regulations, statutory definitions clearly met here. And regardless of what the practice of the Department of the past was, I don't know if the record is clear on that, these dealer's reserve payments meet the statutory standard. Now, at this point, and this is kind of a late, great argument, first-rate reply brief, the taxpayer tax, the idea that this meets the statutory definition of consideration. It meets the consideration because it's a payment, again, by the manufacturer. The manufacturer has less money. The dealer has more money at the end of the day. It meets the standard for consideration. I want to at least also touch upon the use of the Hornoff v. Kroger case, which, again, was first brought out in the reply brief. The Hornoff v. Kroger case, which found that the value of trading stamps, when you look at whether trading stamps were grocery seats, you look at it from the eyes of the retailer. You look at the value of the trading stamps. That was a uniform case. It was clearly limited to trading stamps, as the court there said. When no money changes hands, it would be cumbersome to refer to grocery street seats and street sets. It doesn't undermine the finding of Keystone, Chevrolet, Aragon, Plymouth, and Chrysler and Plymouth, or any of the other decisions that look at what is the amount of money that the individual seller received in a product, regardless of the source of that payment. The statutory standard is clear. The facts meet the statutory standard. It certainly meets the regulatory standard also, and we would just ask that the circuit court's decision be referred to. Thank you. Bob? I will echo a little bit of what counsel said. I don't think the record is clear regarding the history of the taxation of these transactions. It appears to me, though, based on my review of the transcripts and the pleadings and getting into this litigation late in the game, it seems to suggest that it's a fairly recent position that's been advanced against this particular dealership. Again, I think getting back to the focal point where I think the focus should be on here is that the dealers are getting their own money back. They're providing these payments. They've been doing it since the 80s. They view it as the return of their own money, and the department has indicated that the taxpayer failed to meet a standard. The taxpayer failed to meet the burden. The only evidence in the record indicates that this is the dealer's money that's being refunded, and I don't know how the standard was not met. Again, I think that based on the record and the evidence presented that the circuit court's decision should be reversed and judgment should be entered in favor of the dealership. Is there any further follow-up questions I may have to ask? I don't see any. Thank you very much. Thank you very much. We'll be standing in recess until the readiness of the next case.